Ollie SEVERANCE, Appellant,

v.

William A. SOHAN et al., Appellees.

Court of Appeals of Kentucky.

June 9, 1961.

Morris & Garlove, Martin J. Duffy, Jr., Louisville, for appellant.

Peter, Heyburn & Marshall, Thomas Speckman, James W. Hendricks, Louisville, for appellees.

PALMORE, Judge.

At about 6:45 P.M. on April 11, 1958, the appellant, Ollie Severance, while walking across Bardstown Road near the intersection of Deerwood Avenue in the City of Louisville, Kentucky, was struck by an automobile operated by the appellee Launa Sohan and owned by her husband, the appellee William Sohan, who was riding in the car as a passenger. Mrs. Severance's suit for personal injuries was submitted to a jury and resulted in a verdict and judgment for the Sohans. Mrs. Severance appeals.

Bardstown Road at the place of the accident is a four-lane street 40 feet wide. Though its course is northwest-southeast, for convenience it may be considered as running north and south. There are two lanes for northbound and two lanes for southbound traffic. Deerwood Avenue intersects the west side of Bardstown Road, ending there. The portion of the east line of Bardstown Road opposite the mouth of Deerwood Avenue is in the block between Murray Avenue on the north and Maryland Avenue on the south.

At the time of the accident it was dark and drizzling rain. Mrs. Severance was on her way to a church located on the east side of Bardstown Road at Maryland Avenue. She alighted from a southbound Louisville Transit Company bus onto the sidewalk in front of the Liberty Bank, which is located at the northwest corner of Bardstown Road and Deerwood Avenue. There was a lighted street lamp at the intersection, but no traffic signal. After the bus had cleared Mrs. Severance, dressed in dark clothing and carrying a dark umbrella over her head, proceeded to walk directly across Bardstown Road, west to east. Just after she had crossed the center of Bardstown Road she was struck by the Sohan automobile, which was proceeding northwardly in the inner lane for northbound traffic, that is, the lane next to the center line of the street.

Though she testified that she looked for oncoming traffic before leaving the curb and again when she had reached the center of Bardstown Road, Mrs. Severance never saw the Sohan car until it struck her. None of the occupants of the Sohan car saw Mrs. Severance until an instant prior to the impact. Mrs. Sohan, the driver, first saw her at a distance of 15 to 20 feet, at which moment Mrs. Severance had not quite reached the center of the street. Mrs. Sohan immediately applied her brakes but was unable to stop in time to avoid striking Mrs. Severance, who had continued into the path of the car. A dent in the hood of the automobile indicated that Mrs. Severance came into contact with it just to the left of the radiator ornament. According to Mrs. Sohan, she was driving at about 25 m. p. h. when she first noticed Mrs. Severance. Mrs. Severance was knocked 10 or 15 feet by the impact.

Following cross-examination as to whether she could have swerved to the right in order to avoid the accident Mrs. Sohan testified that she was "vaguely conscious" of a car passing on her right at about the time she hit Mrs. Severance. She said that her "city lights" were on, and there was no evidence of substance to the contrary. A bystander at the corner of Murray and Bardstown Road who observed Mrs. Severance as she crossed the street said, in testifying for her, that she last looked both ways for traffic while she was still in the westernmost lane of the street, just after she had stepped from the curb, at which time he also saw the Sohan car approaching at a distance of some 200 feet from the point of ultimate impact. This witness estimated the speed of the Sohan automobile at 23 to 25 m. p. h.

The critical issue in the case is whether Mrs. Severance was in a "crosswalk" within the meaning of KRS 189.570. If she was, then it was Mrs. Sohan's duty to yield the right of way. If she was not, it seems to be an unavoidable conclusion that Mrs. Severance was contributorily negligent as a matter of law.

The statute recognizes two kinds of crosswalks, (1)' a marked crosswalk and (2) an unmarked crosswalk *at an intersection.* In this case there was no marked crosswalk. Appellees introduced in evidence a section of the ordinances of the City of Louisville defining a crosswalk as "that portion of the roadway included within the extension of the sidewalk across any intersection, and such other portions of the roadway, between two intersections, as may be legally designated as crossing places and marked by stanchions, paint lines or otherwise."

Any construction given to the word "extension" is likely to raise problems under different fact situations. Where the intersecting street continues through on the other side, and at the same width, a "straight line" definition is satisfactory. Where the street narrows, widens, or deviates in course at the other end of the intersection, surely the crosswalk must run from corner to corner. But where the intersecting street enters obliquely and does not continue through (as in this case), or where it does continue through but there is an appreciable offset on the other side, a real question arises as to whether an "extension" of the sidewalk should be taken to mean straight along its course or directly across the street by the nearest route. Another possible ambiguity may inhere in determining the width of the sidewalk, especially if it is rounded or flared at the corner, or is of different widths on the opposite sides of the street, or if the actual pavement of the sidewalk is of a different width from the sidewalk easement shown on the official map of the city. All of this we point out in order that municipal legislative bodies may take due note of the pressing need for actual marking of crosswalks, particularly at irregular intersections, and for clarification of their ordinances defining unmarked crosswalks. The object of definite crosswalks is, of course, to keep pedestrians from being injured and killed, and it can hardly be accomplished in the absence of some reasonable means by which both motorists and pedestrians may know exactly where they are.

■ The north line of Deerwood Avenue intersects the west line of Bardstown Road at an angle of slightly over 74 degrees. Therefore, the unmarked crosswalk created by the ordinance, if extended along a straight line, does not traverse Bardstown Road at right angles, but continues across at a slant, following the projected course of the sidewalk bordering the north side of Deerwood Avenue. Unless it must necessarily and obviously mean something different under the circumstances of the case, we construe the word "extension" in its ordinary sense, meaning a straight projection of the sidewalk, continuing the course and width at which the sidewalk approaches the intersection between parallel lines. Therefore, the north crosswalk of Deerwood extends across Bardstown Road at the 74-degree angle and at the same width as the paved sidewalk on Deerwood Avenue bordering the south line of the Liberty Bank property.

It is clear that Mrs. Severance was never in the crosswalk as defined by the city ordinance. The place where she alighted from the bus was slightly north of the north line of Deerwood Avenue sidewalk, as extended, and she admittedly crossed Bardstown Road by a direct perpendicular route, which placed her even farther north of the legal crosswalk at the time she was struck by the Sohan car.

There was evidence that pedestrians customarily crossed Bardstown Road at the place where Mrs. Severance undertook to cross. It was held in Ellis v. Glenn, Ky. 1954, 269 S.W.2d 234, that an unmarked

crosswalk at an intersection, along the projected extension of an intersecting sidewalk, may be established by custom. Though language used in the later case of Myers & Clark Co. v. Layne, Ky.1958, 312 S.W.2d 463, is cited by appellant as authority for the proposition that wherever pedestrians customarily cross is an "unmarked crosswalk," it was made definite in the recent case of Clark v. Smitson, Ky., 346 S.W.2d 780 (rehearing denied June 9, 1961), that an unmarked crosswalk can be established by custom only at an intersection.

We are of the further opinion that where a crosswalk at an intersection, either marked or unmarked, has been established by ordinance there is no reason to look to custom. Pedestrians desiring to cross the street at or in the proximity of a legally constituted crosswalk are obliged to observe the law as opposed to the custom. Moreover, it is enough to lay upon the passing motorist the presumption that he knows the law without further requiring him to be aware of neighborhood custom.

Since Mrs. Severance was not in a crosswalk, and therefore did not have the right to expect vehicular traffic to yield to her, she stands convicted of contributory negligence by her own testimony. She said that she looked for oncoming traffic when she was in the middle of the street, but "didn't see a thing." Yet this was but a fleeting moment before she was struck. Obviously the Sohan car was there, "big as life and twice as natural," as Uncle Remus might have said. Her witness at Murray Avenue, a third of a block farther away from the oncoming car, saw it 200 feet beyond her course of travel. She cannot be heard to say that she looked but did not see what was plainly there to be seen. Jordon v. Clough, Ky.1958, 313 S.W.2d 581, 584; Turner v. Fields, Ky.1958, 309 S.W.2d 752; Monroe v. Townsend, 1948, 308 Ky. 123, 312 S.W.2d 803, 805; Tarter v. Wigginton's Adm'x, 1949, 310 Ky. 393, 220 S.W. 2d 829.

So we come to the question of whether this was a case for a last clear chance instruction, which the trial court declined to give.

Though there are many earlier decisions indicating a rather loose application of the last clear chance doctrine, the more restrictive theory on which this court has settled over the last decade or so is best exemplified in such cases as Kentucky & West Virginia Power Co. v. Lawson, Ky. 1951, 240 S.W.2d 843; Saddler v. Parham, Ky.1952, 249 S.W.2d 945; Underwood v. Gardner, Ky.1952, 249 S.W.2d 950; Johnson v. Morris' Adm'x, Ky.1955, 282 S.W.2d 835; and Whitesides v. Reed, Ky.1957, 306 S.W.2d 249. We shall not clutter the record by extensive quotation from these opinions. Suffice it to say that in pedestrian cases the theory does not come into play until the victim arrives in or so near to the path of the oncoming vehicle as to be in danger of being struck by it. Whatever the driver of the vehicle should have seen and could have done prior to that moment is a matter of antecedent negligence, which is erased from consideration if the victim is found to have been contributorily negligent. Therefore, it makes no difference how long before Mrs. Severance reached the center of the street Mrs. Sohan could or should have seen her, because until she reached that point Mrs. Severance had an equal if not better opportunity to avert the accident than did Mrs. Sohan.

From what we have said it follows that Mrs. Severance was in a position of peril only momentarily before the impact. Under the authorities cited above there must be evidence authorizing the jury to find that the motorist's last chance to avoid the accident after the victim was in a position of peril was in fact a *clear* chance, and not merely a speculative possibility. The physical circumstances of this case alone show conclusively that Mrs. Sohan did not have a last clear chance to prevent the accident after Mrs. Severance reached the

center of the street. Ellis v. Glenn, Ky. 1954, 269 S.W.2d 234, is distinguishable by the fact that Miss Glenn, after arriving at the center of the street, stood there in a position of peril for two or three minutes before stepping into the immediate path of the approaching vehicle. There was no evidence in this case that Mrs. Severance ever broke stride after leaving the west curb of Bardstown Road.

The crosswalk ordinance heretofore mentioned was introduced in evidence and read to the jury over appellant's objection. Her position is that matters of law are not for the jury except as they are outlined by the instructions.

■ KRS 83.080 makes ordinances of a first-class city subject to judicial notice, and in Gnau v. Ackerman, 1915, 166 Ky. 258, 179 S.W. 217, 220, this court said that it is "no more necessary to introduce the ordinance of the city * * * than it would have been to introduce a section of the Kentucky Statutes under which an action was brought". See also Louisville & N. R. Co. v. Galloway, 1927, 219 Ky. 595, 294 S.W. 135, 137; Foreman v. Western Union Telegraph Co., 1929, 228 Ky. 300, 14 S.W.2d 1079, 1080; Home Laundry Co. v. Cook, 1939, 277 Ky. 8, 125 S.W.2d 763, 766; Maupin v. City of Louisville, 1940, 284 Ky. 195, 144 S.W.2d 237, 240; Murphy v. Homans, 1941, 286 Ky. 191, 150 S.W.2d 14, 17; Linder v. Davis, 1949, 309. Ky. 668, 218 S.W.2d 673; and Morrow v. City of Louisville, Ky. 1952, 249 S.W.2d 721, 724. But in Fryrear v. Kentucky & I. Terminal R. Co., 1949, 310 Ky. 250, 220 S.W.2d 546, 549, without reference to the earlier opinions, it was held that KRS 83.080 does not extend to the substance of the ordinance, which must be introduced in evidence. It was pursuant to the Fryrear case that the ordinance was introduced in this case.

We do not know of any way in which an ordinance or any other document may be "introduced in evidence" without being read to the jury unless the requirement is waived by opposing counsel. Indeed, the very words of KRS 83.080 contemplate that the ordinance will be "read as evidence." Therefore, in view of the Fryrear case the procedure followed in the trial court was correct. However, in future cases wherein an ordinance must be proved, after such preliminary matters as the authenticity and applicability of the ordinance have been proved or admitted (or, in the case of first-class cities, established by judicial notice), it will lie in the sound discretion of the trial court to dispense with the actual reading of its substance to the jury.

■ There is one last point, and that relates to the admissibility of the map introduced and used by appellees during the trial. It was prepared by an engineer of the Jefferson County Road Department. He personally made all of the measurements except for the angle of the intersection of Deerwood Avenue with Bardstown Road. This he took from a recorded property map of the city and had it verified by a surveyor. Because the authenticity of the map rested to the latter extent on secondary evidence appellant contends it was not properly admissible. However, the engineer testified categorically that it fairly and accurately represented the area in question, showing the buildings and the dimensions and angles of the streets, and it is our opinion that his having depended to a limited extent on secondary sources of information such as the city map and the work of the surveyor was a circumstance bearing on the weight of his testimony rather than its admissibility. This seems to be the only common sense approach when we weigh it against the common practice of admitting freehand sketches on a blackboard for the same purpose. Since the plat was prepared under the supervision of the expert witness who gave his opinion that it was accurate, the situation is analogous to that of the real estate expert who bases his opinion to some extent on hearsay. Cf. Stewart v. Com., Ky.1960, 337 S.W.2d 880, 885.

Our view that appellees were entitled to a favorable ruling on their motion for a peremptory eliminates the questions raised in appellant's brief as to the form of certain of the instructions.

Judgment affirmed.